Morning everyone. You can see in the standing room only, we've asked the marshall just to make sure the door is cleared. There is apparently a television broadcast into the hallway outside and into the two attorney conference rooms. So if you're uncomfortable where you are or if you're asked to move, please go to one of the conference rooms. I think there's still seating in there or a space for the hallway. We apologize for this, but it's obviously a case of some interest and no small amount of importance. The first matter of both cases, our first matter is Layshock v. Hermitage. Good morning. May it please the court. My name is Anthony Sanchez and it is my pleasure and great responsibility to be representing the Hermitage School District. First, I would ask the court if I may reserve ten minutes for rebuttal. Thank you. This, as you know, is a very important case. Our society, two of the great pillars I think the American society are built on is our constitution, how we honor and interpret our constitution, and education itself. Education, I'm the son of a Mexican immigrant and I'm here today from a father that didn't graduate high school, parents that didn't graduate high school, and it's because of the educational opportunities I've been provided. So it's very dear to me. In addition to the legal question, there's a practical question that's going to be answered here as well. And that question is, can a student demean and say scandalous things about a school district administrator or principal? And how does that affect the administration of the school district and how the school district is able to function in a community? The reason I ask that and the reason I say that is that is of paramount importance for the educational institution to function as it should. The territorial or the geographic approach that some of us spouse for determining whether speech constitutes on-campus speech or off-campus speech is outmoded. It's outdated given the internet. A student, if we take a more traditional approach, a student can walk in a hallway, put up a profile such as the profile of Principal Trosh here on the wall. One student sees it. One teacher sees it. It gets torn down. And then what happens? The student's disciplined. No question that the discipline's appropriate. A student walks across the street, gets up from the school during lunch, sits at a park bench, pulls out his netbook, sends that profile to every student in the school district, every administrator in the school district, and the school district cannot discipline. The internet's changed the nature of the game. I believe that the approach espoused by the Pennsylvania Supreme Court in J.S. v. Bethlehem Area School District balances the concerns of the United States Supreme Court, the Tinker, the Frazier approaches, even Morris v. Frederick. It balances those concerns and those protections for the First Amendment with the concerns that we have today, which arose by way of internet and electronic communication. I think in J.S. the Pennsylvania Supreme Court said the advent of the internet has complicated analysis of restrictions on speech. I believe that's true. What the J.S. Court does in Pennsylvania Supreme Court is twofold, and I think it's very important. First, the J.S. Court looks and says, before we get to Tinker and Frazier, we're going to decide whether this speech constitutes on-campus or off-campus speech. That's a little bit of a different analysis today, given the internet. But what the court does is it looks and it says, is this speech that's directed to the school community, about the school community, has it been accessed at school? That's the test. Then the court says, then we go to Tinker or Frazier, because Tinker in its essence went to political speech. Armbands, silent protest in the school. Frazier went to obscene speech and the like. Interestingly, I think that if one looks to Morris v. Frederick, the United States Supreme Court does very much the same thing. At the beginning of Morris v. Frederick, and that's the bong hits for Jesus case, as we all call it. In that case, one of the first things the court does is the court rejects an argument that this is not a, quote, school speech case. In doing so, the court says, this is school speech. Therefore, we'll go on to the First Amendment analysis. If one reads the Ninth Circuit's Court of Appeals decision in conjunction with the United States Supreme Court decision in Morris v. Frederick, we see that the court also is not wed to these strict geographic or territorial boundaries. In Morris, the facts, and they're outlined more thoroughly, I believe, in the Ninth Circuit case. In Morris, there was a sort of parade. The Olympic Torch was going to be taken through downtown Anchorage. And school was let out that day. They were letting students out to be able to observe the torch being taken through town. On that day, the student in Morris v. Frederick was not, he didn't go to school. He didn't show up at school at all that day. Another fact of Morris, you started out by saying the permanent question is can a student demean or say scandalous things about a school or its administrator. You can't mean that. There's nothing new about students saying demeaning and scandalous things about school administrators. The Internet adds a dimension to it, but that's not a new problem. I agree, it's not. In fact, I think... And the answer to that is yes, isn't it? Yes, but I think, though, that taking a strict territorial or geographic approach to whether that is something that merits and legally merits discipline is different with the advent of the Internet, Your Honor. It's hard to reach. Let's say that students are at a Phillies game and a student is, unbeknownst to the student, he or she is sitting in front of the school principal and says, you know, my school principal, Mr. X, is a real douchebag. He's a real son of a bitch. The school district hears that. The school principal hears that and says, you know, this is undermining my authority. I'm not going to let this little wise-ass say this kind of thing about me. And he takes some disciplinary action against the kid. Is that all right? No, it isn't. And that, in fact, wouldn't pass the mustard of the J.S. Bethlehem case. Why isn't it? Because the three things that the Supreme Court of Pennsylvania looked at to decide if there was sufficient nexus as to constitute on-campus behavior was, is the language directed towards an administrator, is it about an administrator or a principal or a teacher, okay? Is it directed to the school district community and was it accessed at the school district? So it doesn't need two or three, Your Honor. Let me rephrase my hypothetical. One, I think the facts of the J.S. are very different. The nature of the discussion is different. Let me rephrase my hypothetical. The student knows his principal is sitting behind him and wants to get him going. The student had a run-in with the principal a few weeks before and wants to get back at him. So he says, he whispers, and one of those whispers that is loud enough for the person who's not supposed to hear it to hear it, Mr. So-and-so is a douchebag. And then says some other derogatory things about him. And the principal hears it, knows it's intended for him, directed for him, and let's assume there are a lot of his buddies, the kid's buddies sitting around him. Can the principal take action against him for that? In that circumstance, I think it's a closer call. I think probably not. Why not? Because it's really not intended to be directed to the school district community. It's very clear in our case. It's directed at the principal. It's directed to the principal. Why is direction the keystone? Aren't our First Amendment cases, don't they really look at what the purportedly offending speech does in terms of its effect? Fire in a crowded theater, disruption under Tinker. We look at what is caused by this speech, not what it is in the abstract. And here, there was no clear causation by what Justin did. There may have been overall. But why isn't the cause and effect? I mean, that's what Tinker says, disruption or invading the rights of others. In other words, it's an interference. And if there isn't interference, we're going to let people speak. I think that's an interesting question, Your Honor. We look at the early cases from the 40s from the Supreme Court, like Jablonski, and I don't know if this is even protected speech. We have cases. Not in the 40s anymore. As you yourself say, things have changed. They certainly have. But the nature of speech is defamatory speech, is derogatory speech. Is that protected? This isn't an exchange of ideas. This isn't political speech. That could be protected. There are civil cases that could be brought. But the First Amendment allows people to say things that aren't nice. I agree. I agree. But I also think with regard to a Tinker-type argument, though it wasn't our principal argument and there's a waiver argument involved here, I do believe that this is also offensive to Tinker in that this language, this speech, there was a reasonable likelihood it would have caused a substantial disruption. In fact, in my reply brief, I outlined how it did cause a substantial disruption. I felt principally, though, that this was a Frazier case because Tinker deals with political speech while Frazier addresses inappropriate offensive speech. But how did you take Frazier off campus? I believe it depends how we define off campus, Your Honor. I mean, if you look at Morse, it looks like you can't. Well, I see Morse differently, Your Honor, because in Morse, the quote is that if Frazier delivered the same speech in a public forum outside the school context, he would have been protected. That's the majority opinion. And I read that and I see that. But, again, when you look at the facts underlying Morse, this is a student that didn't go to school this day, that shows up at an off-campus school activity and engages in this activity. He just said the magic word, school activity. That's the magic word, the school-funded activity. If we had a ski club event, a school district has a ski club event, and a student doesn't sign up for the ski club event, but then he shows up at the ski resort and gets injured, is he school district responsibility? I'm sorry, I didn't hear your comment. I'm sorry, Your Honor. Would you finish what you were saying? Sure. I was saying if a school district has a ski club event and student A does not sign up for that ski club event, but yet he decides that he's going to go that weekend to the ski club anyway, independent of anything with the school, and he becomes injured at the ski lodge, is it the school district's responsibility? I don't think so because he was not under the care of the school district. And that's exactly the same factual scenario we have in Morris v. Frederick. So if you apply Frazier, what test would you suggest that we use in order to discern when and when we cannot take it off campus? I think that the reasoning provided by the Pennsylvania Supreme Court in JS v. Bethlehem, was the language directed towards an administrator? Was it about an administrator? Was it directed to the school district community at large? And was it actually accessed at the school? What activity would not fit within that? What activity would not fit within that? Would not fit within that test. I'm not sure I understand. In other words, the test is so broad, what activity would not fit within that test? I think that we could look at Morris and we could see that. I could be at home in my home and I could create a MySpace profile. Let's say I just create an actual physical profile. I actually draft something that looks like that. And I put it on my wall next to my posters of rock stars or sports stars. And another student comes to my house and sees it. And they think, gee, this is really derogatory about Principal Trosh and goes back and tells the school district, you know, I saw this poster. It's terrible. That to me would not be covered. That's clearly private. And of course the teacher from the school has a huge big window and puts the picture up in his room knowing the principal every day and every afternoon is going to walk past that window and is going to see it. I still think that probably would not be covered. Why not? Frances, you've made much in both your brief and at the beginning of your argument today about how the Internet somehow should influence how courts consider school speech. And I have to admit that after reading and hearing all you've had to say on that point, I'm still confused as to just how you believe the onset and proliferation of the Internet and Internet activity ought to somehow affect our First Amendment analysis here. For example, how is the legal analysis any different, given the prevalence of the Internet, if instead of using MySpace, Justin had simply published the Trosh profile in a local newspaper? What's the difference? Because the Internet is a surgeon's tool, in this case at least. What? A surgeon's tool. In this case what the student did when he created the MySpace, he immediately, and I'll be careful how I say this because I think I offended you last time, Jez, to mess with this, when I said that the student was friended. He friended people and he said, please, not friend as a verb. Oh, I hate now it's being turned into a verb. You're right. And so what he did though, so he added other students as friends. And what that means is those students immediately get these. So it was very pinpoint. This was very pinpoint. But aren't you turning the First Amendment on its head? The Internet is an enhanced way of communication. Absolutely. How can we turn that around and say that that results in a, therefore, a further burden, a need to further burden speech? We have the Supreme Court's decision in Roe v. San Diego, an employment case with the First Amendment, where the court looks at it that way, as a matter of fact. It's when this police officer creates these pornographic videos and puts them online in a generic police officer's uniform. And the United States Supreme Court felt that the employment, the firing was appropriate because this was put out there, into the public eye, and this made the community's view of what the employer. The court law ensured this was a police officer. Yes. Isn't that very different? Let me try to get back to try to get two answers to my question. You said at the very beginning, in my hypothetical, where the student gives a very loud whispers so the principal can hear it. That is not, the principal can't retaliate. And then you said in response to my picture about the kid living across the street, if he puts the police off in his bedroom, the school can't retaliate. I'm trying to find out why not. What's different? Because it is clear by the use of the Internet in my space, in this instance, that this is clearly directed to the school district. But in my hypothetical, you've got the kid whispering right at the principal. He's just using a very loud directed statement toward his buddy, but it's aimed at the principal. And in the other example, his window is being used basically to beam the image out to the school because, you know, as a principal, we see that poster when he or she goes back and forth to school. So what's the difference whether it's a bedroom window through which the student knows the principal will see it, or whether it's an Internet, and chances are the principal is much less likely to see it on the Internet than if the principal walks past the window every morning and overhears an intended whisper at a ball game. But I think by way of the use of the Internet, there's a much greater possibility that the school community as a whole and more people in the school community will see it. Things on the Internet last forever. Let me ask you two specific questions. Certainly. The district court said that you never attempted to justify your action based on a fear of future disruption. Is that correct? Is that statement correct? I don't believe that statement is correct. Where was there a fear of future disruption here under the facts of this case? Under the facts of Layshock. Under the facts of Layshock, we had a situation. It was a unique situation where there were multiple. We don't want to hear about the actual disruption. Where's the fear of future disruption? And let me cut right to the chase. The school was closed for the Christmas holidays. Justin had been suspended, and the sites had been closed down. Well, it happened before the vacation, Your Honor, and the school. The actual disruption. Right. So there was really no legitimate fear of future disruption given what I've just articulated. The district court also said that you did not establish a sufficient nexus between Justin's speech and substantial disruption, actual disruption of the school environment. There were four profiles here. Right, Your Honor. And you had to show that Justin's profile caused a substantial disruption, and there's very little evidence of that in the district court so far. So you really, I wonder whether, in this case, we even get to the case you're so carefully trying to avoid, Tinker. Your Honor, I think that there was a reasonable likelihood, and I think, in fact, the school was. That wasn't argued to us. You asked first for Frazier. Yes, I did. Yes, I did. I did argue Frazier previously. That is correct. Point blank in the argument, are you relying upon anything other than the Schultz profile? I'm not sure if you argued it. Whoever argued it. And the response was no, or relying only upon the profile of Schultz. It was an argument about the misappropriation of the image. There was nothing about either actual disruption, potential disruption, or a reasonable fear of potential disruption. It was the fact of the profile, not in terms of the subsequent disruption because the school was closed. It hasn't been pointed out. But the fact of the profile itself. That's what was in the letter, and that's what was argued in the oral argument. Yes, Your Honor. If I could address Judge Barry's point first. There was a fear of future substantial disruption, a reasonable fear. In fact, in our brief, we note that the technology person spent 25% of his time working on trying to make sure this couldn't happen again. There was a fear. Judge Barry said there was no nexus between speech and substantial disruption, which to me is a finding of fact. Is that clearly erroneous? No, I think that is a finding of fact. However. A finding of fact? Wasn't this a case that went by way of summary judgment? This was a summary judgment case, Your Honor. There weren't any findings of fact. Okay. Thank you, Your Honor. But no, there was clearly a concern of a future disruption, and that's why they had the computer specialist, Mr. Gingrich, spend all his time. Why is that relevant, Mr. Sanchez? Judge Roth made a point, and I think Judge McKee has as well, that Tinker wasn't argued. So if Tinker is not at issue, and Tinker is the case about substantial disruption or a reasonable forecast of substantial disruption, if your case rests on Fraser, what's material about a discussion of disruption? I mean, aren't you arguing Tinker at the same time you've said I'm not arguing Tinker? Once the court decided, once the panel made this decision and decided that Tinker was applicable and not Fraser, the school district felt that the entire Tinker analysis needed to be applied. While we did not argue Tinker at the panel argument, we never abandoned the position that there was a substantial disruption and there was risk of substantial disruption.  Mr. Sanchez, do you really want an answer right now? Thank you very much. We've served quite a bit of time for you. Thank you. Good morning. May it please the court, Vic Balchuk for the American Civil Liberties Union, Pennsylvania, on behalf of Justin Leshock in this case. The panel in this case applied the law correctly. The district's reconsideration petition essentially restates the arguments from its brief and contends that the panel simply got it wrong. As such, they have failed to provide a sound legal reason to reach a contrary result. Hermitage also argued that the panel's decision conflicts with the JS panel. But on the issue of potential conflict, whether the school district has met its burden under Tinker, Hermitage has waived the argument by not raising it initially in this court. Indeed, as was just pointed out, Hermitage has never raised the precise argument raised in JS, namely, was the disruption foreseeable? As Judge McVeary wrote, defendants have never attempted to justify their action based on a fear of future disruption. The entire argument was justified based on actual disruption, which there's very little of in the record. The district concedes, as it must in light of Morse, that Frazier cannot be applied to off-campus speech. It argues, therefore, that the speech should be treated simply as on-campus speech because Justin copied Trosh's website photo from the internet. His speech was aimed at or about the school, and he allegedly accessed the website in school. The panel rejected all three arguments, and there is no good reason to reach a different result. Although we have invited the court to provide guidance by articulating the proper analytical framework for off-campus speech cases, the panel recognized that, quote, it need not now define the precise parameters of when the arm of authority can reach beyond the schoolhouse gate, end quote, because tinker was not met, and no court has upheld punishment of off-campus speech without a finding of substantial and material disruption. Nothing has changed. Wherefore, we would ask this court to affirm the decisions of the district court and the panel. Let me see the rest of my time. Is there any end point? Is there any point beyond which, even if it's totally, purely off-campus speech, absent the JS and the kind of case which is not advocating silence, but suggesting violence, is there no way a school administrator can act to protect his or her reputation, the dignity of the school, unless there's actual physical, almost a trespass on the property? Your Honor, there is, and I think a distinction needs to be made between being able to sanction and punish particular speech and taking other forms of action. So, for instance, there's a lot of odious speech that is protected by the Constitution. Think about it. I'm sorry, what are the actions that can be taken? Odious speech. Right, so when the Ku Klux Klan holds a rally, it's horrible speech. Clearly, the municipality can't stop it, but the police will, for instance, monitor what's going on, provide protection. Let's come back to the facts. Right, for a school district, Your Honor, the same thing. While this is, of course, it's not pleasant, nobody likes to be demeaned, nobody likes to be sworn at, but clearly under a long line of cases, offensive, vulgar, opprobrious words in abusive language, odious epithets, all of that is constitutionally protected. School officials can certainly call the student in and have a conversation. Say, you know, I saw this. It's really upsetting to me. You're going to be an adult some way, really don't think this is the way to deal with it. Talk to the parents. Does the level of discipline that's imposed matter? Your Honor. That's the direction you're heading. I'm not, Your Honor. What I want to distinguish is sort of non-disciplinary alternatives. Are there any legal actions that can be taken by a school principal in a circumstance like this, other than disciplining the student with a suspension or something like that within the context of the school? If taking the facts of this case. Yes. Your Honor, we do not believe that for this purely out-of-school speech, no matter how vulgar and offensive it may be, that the school can't actually punish Justin for this. They can talk to the student, which they did. They can talk to the parents. The principal could bring civil action if, in fact, it is defamatory. We claim it's not. And in this case, the principal, in fact, has filed a defamation suit against Justin in the Court of Common Pleas for Mercer County. So there are other things that can be done. Would that be protected speech and the defamation action in your view? Your Honor, in fact, we have so argued that case, as Elaine Fallow, the suit was filed against other students. So the preferred course of conduct, in your view, is instead of disciplining within the school system, the school principal should bring a defamation action? You know, I'm not sure that's going to promote a good relationship. Well, you could have him in. And he can say, well, you know, the child, as he described in the panel opinion, the child, you called me a big drunk, a steroid freak. I smoked marijuana. You called me a big whore and a big fag. Now, let's talk about this. This is what you would recommend? This is what a school can do? Certainly, I think that is something that a school can do. And in fact, I wouldn't say a school has to do it. That certainly is. Can the school call the cops? Can the school call social services? That's what you recommend in the other case as well. Your Honor, yes, the school can certainly talk to the student, call in the parents. And in both of the cases we have this morning, the parents were called in. They were upset. They addressed it. And let's not forget the role of the parents in these situations. They filed a lawsuit complaining that their son's civil rights were violated. Correct. What do we do with the fact that Justin brought his computer into school, showed it to classmates in the Spanish classroom, accessed it, showed it to classmates? Under Sachs and Frazier, we said there is no protection for lewd, vulgar speech in school. Is that not in school conduct that under Sachs and Frazier would be punishable? Your Honor, with all due respect, if those were the facts, then maybe yes, but they are not the facts here. What we do know is from the record that Justin once attempted to access his profile in school on Thursday, the Thursday after it was put up, and was not able to because it had been disabled. They had talked to MySpace and it was burning. So it was never shown to classmates? There is a dispute of fact in the record where some students said that Justin was showing it in school, not on his computer. Your Honor, what Judge McVeary said is that is immaterial because what we know is the school administrators didn't know about that until after the fact. They did a computer search to find out who was going on MySpace. It clearly caused no substantial and material disruption at the time. That's not the Frazier test. Disruption isn't the Frazier test. Right, but if the school didn't know about it, and perhaps most importantly as … What do you mean the school didn't know about it? Does it make a difference if the administrators know about it or not? Let me ask this. If Justin had opened it up, if he had shown up and the facts were just as Judge Rendell had said, would you concede that that would be in-school speech? Your Honor, we would concede that it's in-school speech and would say, as in Thomas, that's de minimis in that situation. But it would be in-school speech, but that's not what happened here. If you look at just the disciplinary notice and the charges that were filed against Justin, they do not relate to bringing it into school. They're all about the verbal assault on the principal. And in the panel argument here, counsel conceded that, in fact, they're not punishing him for bringing it in school. The punishment is for the creation of this Internet, and all of that was done outside of school. The hypothetical matter, supposing that he created the profile on the laptop at his grandmother's house, brought the laptop into school, and then shared the profile with other students, does that take it out of the Frasier context? I think that puts it into the Frasier context, Your Honor. I mean, we have not argued that if either of these web parodies had been printed out and mimeographed or Xeroxed to use an old-fashioned form of dissemination and brought it to school as in an underground newspaper, then clearly it could be punished. What if, instead of printing it out, what if they all start talking about what it says and laughing about it and mocking the principal? Your Honor, again... Would it be the same as bringing it in on a piece of paper? Your Honor, it isn't. All sorts of things happen outside of school that are going to get students talking. I'm pretty sure students in Philadelphia are talking about the flyers today in school. Kids do something. That is its own form of illegality. The kind of things that were said here, as hurtful and shameful and lewd as they were, that's very different. Your Honor, what's different is whether it's in school or out of school. If you look at the Supreme Court's jurisprudence in this area, there are four cases. All of them are established based on the special characteristics of the school environment. Is the point of importance the point of creation or where the information is shared? No, it's where the information is shared. I know that there are a number of cases where it's created off-campus. It used to be underground student newspapers. Now we have the Internet. If it's brought into school... Let me give you an example here. What happens if the... What if it potentially could have been brought into the school? I'm sorry, if it... What if it potentially could have been brought into the school? I mean, if it's on the Internet, you can bring it in. If you're on the Internet, it's accessible. The Internet is creating this surrounding possibility to see it. You can't say, like, a piece of paper that is going to be brought in there, but any student has the potential any time in the school to access it and see it in the school. You're on two points, a practical one and a legal one. The practical one is that most schools, and Hermitage now after this occurred, have the sophistication, have the technology to physically block these websites from coming into the school. What happened in Hermitage, if you look at the record, was the school tried to do that. Mr. Gingras, the technology coordinator, thought he had done that, and it was unsuccessful, and it wasn't until he went out and got outside help that they were physically able to block that. So the schools, and in the other case we're arguing, it was already blocked. Nobody can access it in school. On the legal point is if you take the position that, in fact, because it's on the Internet, because it's accessible anywhere, and it is, regardless of where it's posted, then it's subject to regulation. What you're really doing is saying that because the Internet is more effective, we need to apply a different standard. Judge Amber, I had a question. If you apply Frasier, and you have a... I'm sorry, if you're what? If you apply Frasier, which normally applies on campus, but you have a student from home putting a lewd message on a school message bulletin board on the Internet, what happens then? Could I ask a clarification here? Because I think these questions are fact specific. It's a school message thing. It's for all students, and the student from home puts a lewd message on that. Can the school administrators do something to discipline that person, even under Frasier? I think it depends on whether it's school-sponsored and administered or whether some student... The bulletin board is school-sponsored. I think in that case, yes, you could, just as if a student sent it, and I would also say that if a student took this profile and emailed it to Mr. Trosh, then at that point you could punish that. How is that any different than listing 25 or 50 students as friends? It's very different because that's all on campus, and I know that... The administration is not left without a remedy. Isn't tinker applicable in those circumstances? When it's off-campus speech? But it's directed on campus. You're right. Frankly, I think that that is an issue. That's not something that the Supreme Court has ever said, and what this court has said... Well, the question is what can school administrators do in circumstances like the hypothetical that Judge Ambrose just gave me? I can't think that school can do nothing, so I'm asking you, isn't tinker implicated in those circumstances? Your Honor, again, as I said earlier, I don't want to sound like I'm beating a dead horse. There are non-punishment alternatives to the extent there's recourse in civil courts for defamation. You've mentioned recourse in civil courts. I'm sorry. Did you want to ask something? I wanted to pose a small hypothetical, and it is assumed that a student is by himself standing on the sidewalk across from the schoolhouse gate. And this is during school hours. He uses a megaphone, an amplifier, whatever, and hurls lewd speech and invites students on the campus to similarly misbehave. Is the school district powerless to prevent that speech? If they're disrupting the school, then that may be disorderly conduct, and then you're not punishing the student based on the content of his or her speech but, in fact, for the noise and for the disruption. I mean, I think those are very difficult cases, but I come back to the point that, in fact, geography does matter. You mentioned recourse to civil courts or civil remedies, but Tinker also said that the school could take action if the conduct or speech invaded the rights of others. So wouldn't defamation be an invasion of the rights? Your Honor, the only case that we're aware of that has followed that invasion of the rights of others is Harper v. Poeh, which is the Ninth Circuit case. There is a very, very strong dissent from Judge Kaczynski, which says if you take the path that Judge Reinhart took in the majority there, that you're going to eviscerate the First Amendment. We'll note that the Supreme Court granted, vacated, and remanded, but the biggest problem is that that case is completely incompatible with Sachs, where this court, in fact, said that there is no categorical exception for harassment. And in that case, in Harper v. Poeh, you had a student who was wearing a T-shirt saying homosexuality is shameful. Certainly, under the analysis in Sachs, that would not be actionable. Unless you reach the Title IX standard set out in Davis v. Monroe County School District, where you show it's a hostile educational environment. So no court has gone that far as to follow that prong of the Tinker analysis. Why does geography alone matter if a statement is made off campus with a stream of obscenities and urging the students to call the principal and object to some school policy? Is there no remedy to the school policy? Your Honor, as I mentioned, the school speech cases have never been extended either by this court or by the Supreme Court to off-campus speech. In that circumstance, Frazier controls, as long as the speech is made from outside the school house gate. Frazier cannot apply. That's what Morse tells us. It can apply, can't it? If there is speech that originates off-campus but appears in Judge Ambrose's hypothetical on the school message board, can it not then be deemed school speech? Well, I would say that the school-sponsored message board is part of the school. You are posting something that's officially set up by the school. If you have a student who sets up a website saying, look, I have all these gripes with the school, post whatever you want, the school could not punish for that speech. Let's come back to Judge Sirico. Let's stay on Frazier for a second here and change the hypo just a little bit. A student on Facebook directs lewd references about the school principal that are pretty severe. And it goes to, let's say, 100 students in the school. And it is accessed by students in the school, but not on a school-sponsored website of any kind. Frazier really doesn't address that situation, does it? Because in Frazier there was nothing targeted against the school principal. So I'm wondering, it seems to me we're in a different area here. And my question is, do you think that the Supreme Court, when they mentioned Frazier in the Morse opinion, were really thinking about this kind of hypo where it was directed, lewd matters directed to a school principal, but was accessed by people within the school community? Your Honor, I obviously don't know what the Supreme Court was thinking or each of the nine justices would be thinking. And as hurtful as this speech may be, there is a countless line of cases where the Supreme Court has protected speech that's offensive, that's provocative, that involves opprobrious words, abusive language, racial epithets, odious epithets, patently offensive sexual speech, profanity. And the reason the court has said we have to protect those is that it is impossible to draw principal distinctions. We said in fact there is no protection for lewd speech in school. We said that. Don't we have to determine the fact issue of whether this was brought to the school? Your Honor, if it was in school, then yes, it could be subject to Frazier. In fact, as a matter of fact… But Judge Sirica just had in his hypothetical. I thought you had agreed with me earlier that if Justin had opened his web page in school that that would be in school speech. That's just what I understood Judge Sirica to be talking about. If that's accessed in school, it doesn't make any difference whether it was created out of school. That speech is being published in school. Doesn't that make it in school speech and subject to Frazier? And directed to the principal, not just general lewd comments. Your Honor, I think the line would be not who it's directed at. I mean if you have a standard that says speech that's directed at or about a school official and that's the standard, then you are essentially creating a content-based censorship standard. One that invites viewpoint. You said that if it were done within the school context, it could certainly be punished. Correct. Inside the schoolhouse gate, the Supreme Court has relaxed free speech standards. So what the student can say outside the schoolhouse is subject to sanction inside the schoolhouse. So I think it is where the speech occurs, where the speech is distributed, that in fact is the key, not the content of the speech, not whether it's about a principal or provocative of a principal, especially when it's outside the school. If it's lewd, profane, and in the schoolhouse, there need not be substantial disturbance. Correct. Yes, it is a content-based restriction that's permitted inside the schoolhouse gates. Was Justin's punishment based on the sharing of information in the school or the creation of the message outside the school? In oral argument before the panel, that question was asked by I believe Chief Judge McKee and Mr. Sanchez at that time said and admitted that the punishment was based solely on the creation of this profile, the creation which took place on a Sunday in Justin Layshock's grandmother's house using her computer. So it had nothing to do with anything that may have happened in the school and the school was ignorant of that until long after this had been published. Yet he only argued Frazier, which is an in-school case. Yes, that's correct. Is the inference from that that the school was not concerned about the effect of the speech inside the school? I think that's certainly one inference and, Your Honor, if the court were to deem that in fact that tinker argument is not waived and we certainly think that it is waived, it was not raised in the panel argument, it was not raised in their initial briefs. But didn't they raise at least a tinker-type argument? I mean, they may not have raised tinker by name directly, but wasn't there enough tinker-type argument? They certainly argued that there was a nexus. And doesn't that come from tinker? Your Honor, the nexus that they argued was there's a sufficient nexus to the school. Isn't that tinker? Isn't that tinker? Isn't nexus tinker? Nexus isn't Frazier. Well, Your Honor, it's a different type of nexus. The nexus they argued was that there was, because he went on the website and copied the picture because it was directed at school, there's a sufficient nexus to the school to make this on-campus speech because they concede that you can't apply Frazier to off-campus speech. They concede that. So they have to figure out some way to turn this off-campus speech into on-campus speech. If you look at their opening brief, they make two arguments in that neither one of them involves tinker, and as the panel's opinion will note, in three places they say that, in fact, the school district has waived the tinker. Is it enough that they raised it at least in words in their reply brief? It's not, Your Honor, and we filed our 28-J letter on this point, and I know there was a response, and I think Huber is not helpful to the school district. What it says there is if there is a pure question of law, then maybe if it's of supreme importance or it would do an injustice, the court may be able to consider that. While which test applies may be a matter of law, here the issue is how does tinker apply. That's not an issue that was raised. That's not an issue that was briefed in this court at any time, so we would argue that it's waived. We can reach the tinker issue given the factual circumstances here, given the fact that there was precious little evidence, if any, of actual disruption and no attempt to show fear of future disruption. I don't know if we even have to reach, in this case, the tinker issue. I'm suggesting, are you, that if we think we must reach the tinker issue and we believe the tinker should be applied, that we shouldn't apply it simply because they may have waived it? Your Honor, I certainly would not be so bold as to tell the court what to do or how to approach this case. Our argument is that the parties have waived the tinker argument and to the extent the court determines otherwise, there's really nothing in this record to show that there was actual disruption or a basis to forecast disruption, which is an argument that they didn't even make in the district courts. It's never been made, and it's patently unfair to raise that now, especially since we've never had a chance to brief that. So, it's clearly Frazier and the factual underpinning that would allow Frazier to be applied. That's absolutely right, Your Honor. We would ask that the court simply reaffirm the panel's opinion. We think you got it just right. Mr. Sanchez seems to say that any speech by a student, offensive speech, anywhere, including at a baseball game, that targets the school may be disappointing, if I understand correctly. Could you respond to that? I mean, I find that a scary proposition. It's certainly not an authority that either the Supreme Court or this court has given to school officials. While children are in school, they are under the custody and tutelage of the school district. I mean, the parents have relinquished their rights. That's CN, that's Granke, that's Ansbach. But once they leave that schoolhouse gate, you've got parents who come into play. They regain their custody. They regain their rights over that child. Now, as abusive as that language may be at a Phillies game or on the Internet, it is beyond the school's authority to punish that, because while it may be constitutionally unprotected inside the school, whether it's Hustler, whether it's RAV, whether it's ACLU versus Reno, whether it's Johnson versus Campbell in this case, that kind of speech, as much as we may not like it and nobody likes to be sworn at it, nobody likes to be demeaned, that speech is clearly protected. There are other things. Even if the speech has an absolute clear disruptive effect inside the school. Absolutely, Your Honor. Just as an example, I mean, why applying tinker outside the school would be so dangerous, right? So let's take substantial disruption. There's a case been going on here in the Philly area. Many judges may have heard about involving Blake Robbins and the Lower Merion School District, where a student alleged that a school issued laptops and then used those laptops to spy on the kids. Initially that was an allegation. It turned onto a lawsuit. There's absolutely no question that that speech created a substantial and material disruption in that school. They had TV helicopters flying over the school. They had media stationed outside the school. There can be no question that that speech created a substantial and material disruption. There also should be absolutely no question that that speech is and absolutely must be protected by the First Amendment, even if, when making that accusation, he had decided to throw in a few choice words and called his principal a douchebag and worse, for spying on the kids, that's still constitutionally protected. We are going to get to that in the next case, but I'm not sure I understand what you're saying. Are you saying that clearly speech that originates off campus and has a substantial impact, not even realistic foreseeability, but a substantial impact, actual impact, disruptive impact in the school, that the school cannot act to reach that speech? Are you saying that? Your Honor, and I guess we are getting into the next case, that is a question of first impression. What standard actually applies? Let me give you an example just to follow up on that. What about cyberbullying? Somebody is, from a home computer, putting out very demeaning things with respect to another student, and it is causing that student and her family great consternation. The student has become depressed. The parents are worried that the student might commit suicide. You're telling me the school officials can't do anything? Your Honor, first of all, that is a horrible situation that I've actually got personal experience with. I greatly empathize with that. Bullying is absolutely a terrible thing. The first thing I would say is that we need to decide what standard is applied, and even if the court were to apply the Tinker standard, as this court has interpreted Tinker and Sachs The first thing that needs to be looked at is whether that bullying is unprotected, because as then-Judge Alito said in Sachs, there is no categorical exception for harassment. So if it's a simple teasing or name-calling, that may be constitutionally protected. At the point that it becomes sufficiently pervasive or severe, then it may be actionable. And I know as Judge Rendell wrote in a concurrence in that case, it is. These are very, very difficult questions. They're fact-specific. You let him answer that question, but your time's up, and by the proof of the clock, you've got actually five extra minutes. I'll pick up on the next argument on this. Okay. Yes, Judge Shorten. My question is, you said actionable. Are you going back to the process? Do you really want me to answer this? Because you already had five extra minutes. Well, I'll get it in the next go-round. Okay. I'll let you go first. Okay. Send the other clients your bill, too. Thank you, Your Honor. Thank you. Mr. Sanchez, why don't we give Mr. Sanchez an extra three minutes, because the clock did not start on Mr. Walczak, but it should have. So even things out, I think you said 10 minutes. Yes. Don't say 13 minutes, and don't read anything into that number. Thank you. First, I'm sorry that Mr. Walczak's been bullied. The first thing, Mr. Sanchez, aren't you really advocating a hybrid Tinker-Fraser rule of law? I think at one time. What I'm really looking to, Your Honor, is I'm thinking that there has to be an order in approaching this, that we don't even get Tinker or Fraser until we decide whether or not this can constitute on-campus speech by way of nexus. One of the things I wanted to respond to that I thought was interesting, though, is I think it was a point. You're saying we don't get to on-campus speech unless we can. I think first we have to look at on-campus speech. Does it constitute on-campus speech? Is there sufficient nexus? Then we look at the type of speech. The only reason we're doing that is because of Tinker and Fraser, isn't it? That's the only reason we're looking at that. You're saying before we can decide whether it's Tinker or Fraser, we have to first determine whether or not we're applying Tinker or Fraser. No, I think we have to first. Well, I guess Tinker means a lot of things. To me, Tinker means political speech, where Fraser means obscene speech. I guess my point is, you know, you started off saying that you were advocating the standard as the Pennsylvania Supreme Court adopted in JS v. Bethlehem. Yes, Your Honor. You said first of all you have to find, you have to look at locality. Yes. Okay, and then you have to look at Tinker or Fraser. You have to look at the rule of law to apply if you can get the nexus. My question, though, was aren't you really asking us to adopt a hybrid rule of law? And if you are, does part of that rule require intent to bring the speech onto campus or into the school community? I don't know if it's adopting a new rule of law, Your Honor, or a hybrid, because I think that the Pennsylvania Supreme Court in that JS case was faithful to both of the Supreme Court decisions. Well, that's a new rule of law for us. We're not fond of what the Supreme Court said in JS v. Bethlehem. I understand. I understand, but I think that, though, the way I read the JS decision from the Pennsylvania Supreme Court, Your Honor, is I think that they were consistent with both Tinker and Fraser. I don't think that they created any new law. I think you're asking us to adopt the hybrid. I don't know if it, well, the other thing that I said before, too, is that is the approach the Morse Court took. The Morse Court first looked and said, is this on-campus speech? That was the first thing they did. Then they went on to the analysis and said, you know, well, this isn't Tinker. We're not sure if it's Fraser, but it's promotion drugs. That's how I read what the Morse Court said. But one of the interesting things that I heard in argument here, I believe it was in response to a question from Judge Rendell, is that counsel for Layshock said that a school message board is part of a school. And in this case... A school-sponsored school message board. Yes. In this case, this case starts, this issue starts on a school district website. School district websites are as much part of a school district now as an elementary school. Are you seriously arguing that if I were to go on to, or say, a child that I might have in a school, or on to a school district website, cut and paste something from that website, that that's, you're almost arguing a kind of a cybernetic trespass. No. I think what I'm arguing, Your Honor, is, again, I'm going back to that nexus test, what I talked about. Is it directed towards a school district community? Is it about a school district administrator? And here at the very beginning, at the very beginning of it, you're getting to a test that is not content-neutral. Because if a kid wants to go on to the school website, take the principal's picture, and then beam it to the entire school saying, I think Mr. Choules is the world's greatest principal, he's my kind of guy, if I could vote, I would suggest that he be a candidate for the Board of Education. My guess is the kid's not going to get suspended for that. So if we're looking at the intent of the school and beaming it into the school, then we're into a content inquiry, because if you beam it into the school and it's intended to be negative or adverse to the school administrators, you're in trouble. If you beam it in to, quote, suck up, or because you want to advocate a positive opinion, then you're okay, you go to the head of the class. I don't think it's an intent question. When I walk into an elementary school, I am on school property, regardless of what my intent is. When I go on to a school district website, I am on school district property, regardless of my intent. I mean, Frazier, all the cases have to do with activity in school. Frazier wasn't a nexus case. In Frazier, there was a captive audience. The student was making obscene remarks in an assembly convened by the school. I mean, those are key facts here. So, I mean, I don't know where you're getting this nexus. What case has said, if there's a nexus, that that means it's in school? Under Frazier. I, that's a good point. And I, but what I believe, Your Honor, is I think, again, the very essence of the Internet has to, one person once said to me, it's not a matter of where you throw the grenade, it's where the grenade lands. And I think that that's very much applicable here. The Internet is a different tool. It reaches, it reaches the entire school community. The question is, what case takes Frazier off campus, in effect? Or makes it anything less than the fact of the case. Exactly. Do you know of any case? I don't believe there is a case on point with that, no, Your Honor. However, we do. All I was trying to do was say that conceivably there could be, if you had a school-sponsored message board and somebody from a home accessed it, it might fit under Morse in that it's a school-sponsored, something a school-sponsored deemed to be part of the school activities. That's just one example. One of the other things that I wanted to touch on is I think that, you know, we'd all agree that school districts, it's critical for school districts and schools to be able to function. And I think, you know, when we talk about the problem with cyberbullying and the like, I think that this very problem could exist with an administrator, with a principal, not just students. But there you're talking about impact again. There you're talking about firing the theater and the effect in the school. And that's tinker, and that goes back to Judge Fischer's question. Are you really doing a hybrid here? Well, I have another question. I'm sorry. When you say that, that's back to tinker, right? As soon as you start talking about effect, you're talking about disruption. You're off of Frazier and you're back to tinker, aren't you? Yes. Yes. And I think that the facts of this offend both tinker and Frazier. I believe that. And your assertion for why it offends Frazier is because he clipped the picture from the school website? That's not the only reason. I believe that there's sufficient facts that there is a nexus. I don't think. But what are they? What are they? He takes the picture from the website. He creates this phony MySpace profile. He sends it to students. He accesses it at school. He doesn't send it to anybody. Well, he friends it. Pardon me, Judge Smith. He adds students as friends. I've got to get that right. I will get that right sometime. Whether it was accessed at school is a matter of dispute, right? Yes, but there were two students that did say that he showed it to them. So there is an issue of facts. His profile or a profile? I'm sorry. His profile or a profile? That profile, the one he created, not one of the others. Your adversary said during the first oral argument you conceded that he was disciplined solely not based on what may have happened when he opened it up or not at school. Is that the case? I don't recall that because I went back while he was making that argument. It's in the opinion. In my brief, Your Honor, I outline the reasons why he was disciplined. And I say and I outline them. One of them was harassment of a school administrator via computer Internet with remarks that have demeaning implications. We press you on that because it made a gigantic difference to our inquiry. At least in my way of thinking, it made all the difference in the world if we're talking about substantial disruption in school, be it if you tinker or something else. And when you were pressed on that and the answer was very clearly we're relying solely on the profile of Troche. And I think the reason was because you had a finding of fact on the part of the district court. You weren't arguing it was clearly erroneous. And the district court said no substantial disruption. There wasn't an appeal taken on that issue. So you either had to argue substantial or clearly erroneous on those facts, which you didn't, or you stuck with the Troche profile and you ended up in response to a direct question saying it's the Troche profile. And taking the picture as you're arguing now. The business wasn't there. Well, I think with regard to that, Your Honor, I mean, it's all pieces of a part. I mean, the taking of the Troche profile and creating this and sharing it with other students and accessing it at school, that is harassment of a school administrator via the computer Internet with remarks that have demeaning implications. It's the same thing. It's exactly the same thing. I think the as far as this issue not being raised and being briefed, you know, in the Layshock brief, in response to our brief, they clearly go through a section where they say Justin's speech is protected under Tinker because it caused no disruption. That's one of their arguments when they reframe my argument. And that's why the reply brief says no. We believe there was a substantial disruption and we believe that there was a disruption. And that is why we're questioning you so closely, Your Honor, at the argument. Aren't you held to your position at the argument? I believe that one of the difficult inquiries, at least for me, is that when we look at Frazier and we look at Tinker, they're not, in my mind at least, so separate. You have a situation where you have school speech. To me, that's the legal issue. Frazier, of course, goes to the one end, obscene speech. Tinker, of course, goes to political speech. So we were arguing that Frazier, Frazier, this was an obscene speech case and that's why it was applicable. However, that does not mean we ever conceded that there was not a substantial disruption or a reasonable risk. The district court found that there had been no substantial. I'm sorry, Your Honor? The district court found that there had been no substantial. Right. By virtue of Justin's profile. The other three profiles were even worse than Justin. Yes, Your Honor. And there was no way, the way I read the district court's opinion, to isolate the disturbance caused by Justin's profile, which was the only one before it, and the other three, which were worse. Yes, Your Honor. It's one of the reasons I wonder whether we even get into this discussion as a matter of. . . A couple things I was thinking, Your Honor, and I think you went through this a little bit earlier, was there a risk of continued disruption? And obviously the school believed that when they had their computer specialist spend 25 percent of his time trying to repair it. And as Counsel for Layshock pointed out, they tried something. It didn't work. They went out and got outside help. They spent money. They expended funds. The siren member of the court will now answer the question. Thank you, Your Honor. I've been staging for the next one. What's our standard of review of the finding that there was a substantial disruption? The district court's finding that there was not. No. No material fact. It was summary judgment, right? It was summary judgment. Okay. There was no disputed material fact that there was no disruption. There was no disruption. Right. But you didn't challenge that. So aren't you stuck with that finding? Well, that's what I think is Andrew Eagle's conclusion. I think that I have challenged it in the sense that, yes, did I write the words in my principal brief, this offends Tinker because there was a substantial disruption or reasonable likelihood of substantial disruption? I did not write that. However, when that was brought up in the second step brief by Layshock's counsel, that was clearly addressed in the reply brief that we believe there was. I believe it's a footnote. And when I say footnote, it sounds brief. And, of course, the way I write it, it's not brief. It's footnote 2 at pages 8 and 9. It's a footnote reply brief. It's a substantial. And just to be clear, what the district court said was a reasonable jury could not conclude that the substantial disruption standard could be met on this record. The actual disruption was met. On this record. Right. Thank you. The problem that I also see arising from this is, to use your, to any of these examples, what if later on Eric Trosh is asked by the student to write him a letter of recommendation? And the student doesn't write him a letter of recommendation. Is that going to be retaliation? He's not going to make that request. Is that? But, like, bear with me. But would that be retaliation, First Amendment retaliation, if the student, if Mr. Trosh would not write such a letter of recommendation? Maybe he could afford a copy of the profile. Wouldn't that be retaliation? No. I believe that this is a, as I said, I believe the Internet changes the turf that we're on. And I know Judge Smith asked me for that earlier. I think one is that you do have questions. Like this question, is the message board part of school? Sure it is. The Internet these days is part of school. So, I mean, just because speech travels more quickly now, does that justify greater regulation of that speech? Isn't that what it all comes down to? A lot of people are asking that question. I think that it's not speed as well. I have a footnote in here where I cite from a Gallup survey. And students today, that's how they communicate. That is a primary method of communication is the Internet. MySpace, my own children, our teenage students, they communicate by MySpace, and the MySpace profiles go through their phones. Where does that take you in a First Amendment analysis? Where, because it's the way they communicate? Therefore, the First Amendment is less, it seems to me. No, I think the First Amendment is the same. I don't think it changes the First Amendment. What I think it does, though, is I think what we consider on-campus changes because of the Internet. I think that it was easy in 1969. You were in the building. You weren't in the building. Your time is up now. Anybody ended up with more time than anyone intended. Thank you very much. Thank you for your attention. Thank you very much for a very helpful argument. I take that as an advisement. We'll briefly break to read 5 to 54.